# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHEAL OUTLEY,                )
                               )
         Plaintiff,            )
                               )
         v.                    )        Case No. 13 C 1583
                               )
CITY OF CHICAGO, a Municipal   )        Judge Joan H. Lefkow
Corporation, THOMAS POWERS,    )
ALAN STARK and PAUL MAZUR,     )
individually,                  )
                               )
         Defendants.           )

## OPINION AND ORDER

Micheal Outley brings this action against the City of Chicago and individual defendants

Thomas Powers,[1] Alan Stark,[2] and Paul Mazur[3] alleging employment discrimination based on

race, as well as retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended

42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1983 and 1981. After a motion to dismiss Outley's

fourth amended complaint (dkt. 118), four counts remain.[4] Specifically, Outley brings Title VII

---

[1] Powers was the Commissioner of the City's Department of Water Management (Water Department) from July 1, 2010 until he retired effective May 1, 2016. (Dkt. 203, Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts ("Pl. Resp.") ¶ 3.)

[2] Stark has been a Deputy Commissioner at the Water Department since September 1, 2011, and was acting up—meaning temporarily filling a vacancy in a higher office—in that role for approximately two years prior. (*Id.* ¶ 5.)

[3] Mazur was a Chief Operating Engineer (COE) at the City's Lexington Pumping Station from December 1, 2011 until he retired on June 30, 2014. (*Id.* ¶ 7.) Mazur was also an Assistant Chief Operating Engineer (ACOE) at the Water Department from September 1, 1991 until November 30, 2011. (*Id.* ¶ 6.)

[4] In addition to the four remaining counts, the fourth amended complaint asserted claims for violation of Title VI (count V), negligent supervision (count VI), and intentional misconduct (count VII). (Dkt. 118.) In response to defendants' motion to dismiss, Outley voluntarily withdrew: (a) claims against the individual defendants under Title VI, Title VII, and for negligent supervision; (b) count VII, his

claims for racial discrimination (count I) and retaliation (count II) against the City, which have been limited to conduct that occurred after December 17, 2011,[5] and § 1981 (count III) and § 1983 (count IV) claims against the City and the individual defendants, where count IV has been limited to conduct that occurred after February 28, 2011.[6] (*See* dkt. 160.) Defendants now move for summary judgment on all remaining counts.[7] (Dkt. 195.) For the reasons stated below, the motion is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable

---

intentional misconduct claim; (c) his equal protection claim to the extent it invokes retaliation; and (d) his claim for punitive damages against the City. (Dkt. 160 at 2 n.3.) On May 31, 2017, this court dismissed count V (violation of Title VI) and count VI (negligent supervision). (*Id.* at 2–4.)

[5] This court previously found that any Title VII failure to promote discrimination claims for conduct occurring prior to December 17, 2011 (300 days prior to Outley's October 2012 EEOC charge) are time barred. (Dkt. 71 at 8.) The alleged retaliation began in October 2012, and falls within the actionable time period, as Outley filed his retaliation-related EEOC charge within 300 days on May 9, 2013. (*Id.*)

[6] This court previously found that Outley's claims under § 1983 are time-barred to the extent they arose before February 28, 2011. (Dkt. 71 at 9; dkt. 160 at 5.)

[7] The court's jurisdiction rests on 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Day* v. *N. Ind. Pub. Serv. Co.*, 987 F. Supp. 1105, 1109 (N.D. Ind. 1997); *see also Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## LOCAL RULE 56.1

Unless otherwise noted, the facts set out below are taken from the parties' Local Rule 56.1 statements, and are construed in the light most favorable to the non-moving party. The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). In accordance with its regular practice, the court has considered the parties' objections to the statements of facts and includes in its opinion only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion. Any facts that are not controverted as required by Local Rule 56.1 are deemed admitted.

Preparation of this opinion has been made particularly difficult by Outley's counsel's failure to comply with Local Rule 56.1 in responding to the statement of material facts and preparing a statement of additional facts. This court's standing order directs counsel to read *Malec* v. *Sanford*, 191 F.R.D. 581 (N.D. Ill. 2000) and *Buttron* v. *Sheehan*, 2003 WL 21801222

(N.D. Ill. Aug. 4, 2003), which detail the oft-occurring pitfalls encountered when preparing summary judgment filings. Outley's counsel has apparently not recently reviewed *Malec* or *Buttron*, since Outley's submissions run afoul of the helpful guidance in those cases: (1) a response to a movant's statement of facts is neither the place for argument nor additional facts that do not actually dispute the factual statement; (2) the paragraphs in a statement of facts should be short and not argumentative or conclusory; (3) paragraphs also must contain specific references that support the factual allegation, and the specific references provided should not be so voluminous that they send the court on a wild goose chase nor should they rely on inadmissible material such as hearsay; and (4) "supporting documents submitted with a motion that are not referred to in the statement of facts will be ignored." *See Malec*, 191 F.R.D. at 583–87; *Buttron*, 2003 WL 20801222, at *1–6. The motion could likely have been granted by simply rejecting Outley's Local Rule 56.1 submissions. The court has done its best, however, to winnow the facts to those supported by the record to resolve the case on the merits.

## BACKGROUND

Micheal Outley, a black man, was a member of the City of Chicago's Department of Water Management (Water Department) from March 1, 1993 until August 1, 2017. (Dkt. 203, Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts ("Pl. Resp.") ¶ 1.) Defendants maintain that Outley retired effective August 1, 2017, while Outley asserts that he was constructively discharged as of that date. (*Id.*) On or about December 1, 1998, Outley was promoted to Assistant Chief Operating Engineer (ACOE), and held that title until July 31, 2017. (*Id.* ¶ 20.) From 2010 through 2017, Outley applied for a promotion to Chief Operating Engineer (COE) on numerous occasions, but was denied a promotion each time. (*Id.* ¶¶ 33–47.)

### A.    Hiring Procedures

The procedures used to fill the COE position were the byproduct of *Shakman* v. *Democratic Org. of Cook Cty.*, No. 69 C 2145, in which the City entered into a consent judgment, which was intended to "eliminate the conditioning, basing or affecting of employment with the City of Chicago on political reasons or factors while maintaining the ability of the elected officials of the City lawfully to establish, manage and direct the policies and affairs of the City." (*Id.* ¶ 22; dkt. 197-13 at 2.) As part of that litigation, a federal monitor was appointed to oversee the City's compliance. (Pl. Resp. ¶ 23.) Further, pursuant to an agreed settlement order, the City and the monitor devised a new hiring plan, which was approved by the court on January 18, 2008. (Dkt. 197-13 at 14–21.) On June 16, 2014, the court found that the City was in substantial compliance with the settlement order and dismissed the City as a party to the lawsuit. (*Id.* at 24–27.)

For the years 2010 through 2014, the hiring procedure (called the Foreman Promotional Procedure) consisted of three parts: (1) a multiple choice test of ethics, *Shakman*, and personnel rules; (2) a multiple choice test on technical and supervisory skills; and (3) an oral interview with questions designed to assess supervisory skills and technical knowledge. (Pl. Resp. ¶ 24.) According to the City's hiring plan, which was approved by the court in *Shakman*, interview questions were to be developed by the City's Department of Human Resources (HR) and Water Department, and drawn from predefined job-specific questions related to the hiring criteria for the vacant position. (*Id.* ¶ 26; dkt. 197-9 at 74.) Applicants for the same position were to be asked the same core interview questions, although additional follow-up questions were permitted. (*Id.*) Applicants received a percentage-based score on each part of the hiring process and were required to pass each part of the procedure before moving on to the next. (Pl. Resp. ¶

25.) The selection process for promotion occurred during a consensus meeting lead by an HR recruiter and attended by all interviewers and the hiring manager for that year. (*Id.* ¶ 27.) During the consensus meeting, the participants created a ranked list of all candidates who passed the three parts of the testing process. (*Id.*) The applicants were ranked first based on their average total score—100% to 90% were most qualified; 89% to 80% were highly qualified; and 79% to 67% were qualified—and then by seniority as defined in the relevant collective bargaining agreement.[8] (*Id.* ¶ 25) If no consensus could be reached during the meeting, the hiring manager was tasked with making the final selection decision and was required to provide written justification for the decision, which was then reviewed and approved by HR. (*Id.* ¶ 28.)

For the years 2015 through 2017, the Water Department moved to a two-part process, which included a written test/skills assessment and an oral interview. (*Id.* ¶ 29.) For those applicants who passed the test and were interviewed, a consensus meeting was held to discuss which of these applicants were best suited to fulfill the responsibilities of the position. (*Id.* ¶ 30.) An HR recruiter was tasked with taking notes during the meeting. (*See, e.g.*, dkt. 197-11 at 31, 39.) According to the selection requirements in the 2015–2017 COE job posting, interviewed candidates receiving a passing score on the written test and possessing the qualifications best suited to fulfill the responsibilities of the position were selected in seniority order according to the collective bargaining agreement. (Pl. Resp. ¶ 31.)

Outley admits that he does not know how it is determined who is promoted to COE (dkt. 197-15 at 81:7–10) but maintains that although the promotion process was supposed to be objective, it was highly subjective in its application. (Pl. Resp. ¶¶ 24–30.) "Whites were given

---

[8] The relevant collective bargaining agreement defined "seniority" as "the employee service in the job title (time-in-title)." (Dkt. 197-9 at 67.)

answers to multiple choice [questions on the written tests] ahead of time and [the oral interview] required certain key phrases designed to trick applicants and provide a basis to lower their scores, all while appearing to be totally objective." (*Id.*) He also contends that black applicants scored much lower on the interview portion of the test than the written portion of the exam. (*Id.* ¶ 24.)

### B.     Promotion Specifics by Year

In 2010, no one was promoted to COE. (*Id.* ¶ 34.) In 2011, Paul Mazur, James McCarthy, Nick Denver, and James Gerzon—all white men—were promoted to COE. (*Id.* ¶ 35.) Their test scores were: Mazur (part I: 90%; part II: 85%; part III: 64%; average: 80%); McCarthy (part I: 90%; part II: 90%; part III: 82%; average: 87%); Denver (part I: 85%; part II: 85%; part III: 70%; average: 80%); Gerzon (part I: 90%; part II: 85%; part III: 66%; average: 80%). (Dkt. 197-11 at 6.) These average scores of 80% or above put the four men into the highly qualified category, and they were the most senior of the nine highly qualified applicants. (*Id.*) Outley scored 90% on part I, 75% on part II, and 60% on part III, for an average of 75%, which put him in the qualified category. (*Id.*) He was the third-most senior candidate of the thirteen applicants that passed all three parts of the promotion procedure. (*Id.*) Defendant Alan Stark was one of the interviewers and the hiring manager for 2011. (Pl. Resp. ¶ 37; dkt. 197-5 at 14.) The 2011 promotions occurred after a re-test that was called because Paul Mazur lodged a complaint stating that the City had discriminated against him based on ethnic favoritism and nepotism when it failed to select him to fill one of the COE positions. (Dkt. 197-11 at 11.) After the re-rest, Paul Mazur was promoted to COE while Donald Knusta and Maurice Walsh were not promoted despite having been selected for promotion prior to the re-test. (*Id.* at 8–22.) An arbitrator found that the re-test violated the collective bargaining agreement and ordered that Knusta and Walsh

be promoted in COE in 2012. (*Id.* at 22.) In 2012, Donald Knusta (white) and Maurice Walsh (white) were promoted to COE pursuant to the arbitration award resulting from the 2011 re-test. (Pl. Resp. ¶ 39.) And in 2013, no one was promoted to COE. (*Id.* ¶ 40.)

In 2014, Mark Henmueller (white) and Joseph Lynch (white) were promoted to COE. (*Id.* ¶ 41.) Their test scores were: Henmueller (part I: 100%; part II: 85%; part III: 82%; average: 89%); Lynch (part I: 95%; part II: 90%; part III: 72%; average: 86%). (Dkt. 197-11 at 28.) These average scores of 80% or above put the two men into the highly qualified category. (*Id.*) Of the six individuals in the highly qualified category, Henmueller was the most senior, while Lynch and Vince Nally had the same hire date. (*Id.* at 27.) Stark was the hiring manager for 2014, but he did not have to break a tie—a lottery was held during which the names of the two candidates were typed on a piece of paper, folded, and picked at random. (Dkt. 197-11 at 29.) Lynch's name was chosen and he was thus promoted. (*Id.*) Katherine Ealy, a black woman, was also in the highly qualified category with an average score of 86% (like Lynch), but was the second-most junior applicant out of the six highly qualified individuals. (*Id.* at 27.) Outley scored 85% on part I, 85% on part II, and 66% on part III, for an average of 79%, which put him in the qualified category. (*Id.* at 28.) He was the third-most senior candidate of the thirteen applicants that passed all three parts of the promotion procedure. (*Id.* at 26–27.)

In 2015, Andre Holland (black) and Robert Mussen (white) were promoted to COE. (Pl. Resp. ¶ 43.) Nine out of twenty applicants passed the written portion of the new two-part procedure and were then interviewed. (Dkt. 197-11 at 30.) At the consensus meeting, it was determined that Holland, Mussen, and Thomas Barrett possessed the qualifications best suited to

fulfill the responsibilities of COE. (*Id.*)[9] Of the three, Mussen was the most senior, and Holland and Barrett had the same seniority date. (*Id.* at 33.) According to the collective bargaining agreement, the tie breaker was the applicants' seniority within bargaining unit titles, which meant that Holland was promoted. (*Id.* at 34.) The notes from the consensus meeting indicate that Outley "didn't go into a lot of detail," was "short on answers concerning pumps," "was confusing on his answer for #5," performed "poorly on answer about what he'd do when [an] employee [is] injured," "made it sound it's as simple as pushing a button, which it's not," and "did not convey that he knew that answer." (*Id.* at 32.) One interviewer was "concern[ed] about thoroughness." (*Id.*) And the interviewers agreed that Outley was "not ready for chief." (*Id.*)

The City maintains that Outley did not apply for the COE position in 2016. (Pl. Resp. ¶ 45.) Outley counters that he "turned in his submission for the 2016-17 test but was not called to take the test." (Dkt. 203-3 ¶ 7.) In support, Outley states as much in his declaration and cites to an exhibit of a computer dashboard that shows the years for which he allegedly applied to the COE position. (Dkt. 203-19.) While the exhibit does not show a job posting or application submission for 2016, it is also missing a submission for 2011, a year in which the parties agree Outley applied for the position. (*Id.*) Outley is not included on the 2016 spreadsheet listing COE applicants, test results, and interview times for those who passed the test. (Dkt. 197-11 at 36.)

---

[9] Martin Wise's (the HR recruiter) notes from the 2015 consensus meeting do not contain detailed descriptions of the discussions related to Holland and Barrett. (*See* dkt. 197-11 at 31–32.) There is, however, a chart for these two candidates indicating that they were recommended by all present at the consensus meeting. (*Id.*) Given that these are the only two candidates that everyone agreed should be promoted, the court assumes the lack of notes is because there was a consensus as to these candidates from the start. There are detailed notes related to Mussen, which provide a primarily favorable view of the candidate. (*Id.*) Further, in his declaration, Martin Wise attests to the fact that Holland, Mussen, and Barrett possessed the qualifications best suited to the COE role. (Dkt. 197-11 at 3.) Finally, it is also clear from his notes that the six other applicants, including Outley, were not viewed favorably by those in the consensus meeting. (*Id.*)

In 2017, Katherine Ealy (black) and John Murphy (white) were promoted to COE. (Pl. Resp. ¶ 46.) Nine out of fourteen applicants passed the written portion of the two-part procedure and were then interviewed. (Dkt. 197-11 at 38.) At the consensus meeting, it was determined that Ealy and Murphy possessed the qualifications best suited to fulfill the responsibilities of COE. (*Id.* at 39–40; Pl. Resp. ¶ 46.)[10] Outley again contends that he was denied the opportunity to take the COE exam in 2017. (Pl. Resp. ¶ 46.) But the 2017 spreadsheet lists Outley's name, an interview date and time, and the fact that he was not chosen for COE. (Dkt. 197-11 at 38.) The consensus meeting notes also have a long section devoted to Outley's performance during the interview, much of which is unfavorable. (*Id.* at 39.) Most importantly, Outley admitted during his deposition that he was interviewed for the COE position in 2017. (Dkt. 197-15 at 55:8–59:10.) He also agreed that during his 2017 interview, neither interviewer said anything or did anything that would lead him to believe his race was being considered. (*Id.* at 59:6–10.)

## C.    2012 Events

In addition to the specifics related to promotion, several discrete incidents make up the basis for Outley's retaliation claim. Although Outley's written submissions are not always consistent as to which incidents are part of his claim, the most relevant details follow.

*The Doctor's Note*

On January 25, 2012, Outley gave his immediate supervisor, defendant Mazur (who had

---

[10] Martin Wise's (the HR recruiter) notes from the 2017 consensus meeting do not contain detailed notes for four of the nine candidates interviewed. (*See* dkt. 197-11 at 39–40.) There is, however, a chart for each of these candidates indicating that they were not recommended for promotion by all present at the consensus meeting. (*Id.*) The court assumes that the lack of notes is because there was a consensus from the start that these candidates should not be promoted. Further, in his declaration, Martin Wise attests to the fact that Murphy and Ealy possessed the qualifications best suited to the COE role. (Dkt. 197-11 at 4.)

been promoted to COE in late 2011), a doctor's note stating that he was suffering from diabetes and hypertension. (Pl. Resp. ¶ 59.) On January 31, 2012, at the direction of his supervisor (Mark O'Malley)[11], Mazur directed Outley to Mercy Works, a third-party medical vendor used by the City. (*Id.*) Mazur maintains that he asked Outley to go to Mercy Works to determine if he had any work restrictions because of his diabetes and hypertension. (*Id.*) But the note Outley brought back from Mercy Works did not state whether Outley had any restrictions: "This is to inform you that based on patient's medications, his diagnoses are diabetes type 2 and hypertension. Please call me if you have any questions." (Dkt. 197-10 at 45.) On February 6, 2012, Mazur then presented Outley with a written directive from O'Malley to obtain a note from his doctor by February 14, 2012 describing his medical condition and any resulting limitations to performing his job. (Pl. Resp. ¶ 60.) On February 24, 2012, O'Malley requested a pre-disciplinary hearing for insubordination against Outley because he had not followed the directive to provide a doctor's note describing any work limitations. (*Id.*) Outley maintains that Mazur's conduct was retaliation for applying for the COE position and for filing complaints with EEOC and HR. (*Id.* ¶ 59.) Outley had not yet filed such complaints.

*The First Charge of Discrimination (October 12, 2012)*

Outley filed a charge of discrimination on October 12, 2012 with the Equal Employment Opportunity Commission (EEOC). (*Id.* ¶ 73.) He stated that "[o]n or around October 1, 2012, [he] was not selected for the position of [COE]," and thus believed he had been "discriminated against because of [his] race." (*Id.* ¶ 73; Dkt. 197-17 at 3.) The EEOC sent Outley a right to sue letter on December 3, 2012. (Dkt. 118-1.)

---

[11] O'Malley is the Engineer of Water Pumping and has overseen the Division of Water Pumping since 2005. (Pl. Resp. ¶ 15.)

*The HR Complaint*

On October 24, 2012, Outley also filed a complaint with HR alleging, among other things, that he "believe[d] [he] was discriminated against because [he] was not promoted to the Chief (COE) position." (Pl. Resp. ¶ 65; dkt. 197-3 at 57.) He noted that "[n]one of [his] contemporaries have an extensive background in engineering like I have," and that "[t]he only common denominator is that they are all white." (*Id.*) Outley also commented that Mazur "is racist," and that he "has always been hard on black employees." (*Id.* at 59.) The City's EEO department interviewed Mazur on December 18, 2012 in response to Outley's complaint and found Mazur to be credible. (Pl. Resp. ¶ 65.) HR ultimately discontinued its investigation without making any findings after Mazur retired on June 30, 2014. (Pl. Resp. ¶ 65.)

*The Flag*

On November 5, 2012, Mazur filed a request for a pre-disciplinary hearing for insubordination, conduct unbecoming and failure to perform work by Outley. (Pl. Resp. ¶ 60.) On September 11, 2012, Mazur had directed Outley to lower the flag to half-staff (as requested by O'Malley) in honor of September 11. (*Id.*) Outley refused to lower the flag and allegedly told Mazur to "get off your fucking ass and do your job." (*Id.*) After a pre-disciplinary hearing was held on February 13, 2013, the case was closed and no discipline apart from verbal counseling was meted out because there was no third-party witness to the events. (*Id.*)

*The Denial of Overtime*

Outley filed a grievance on or around December 12, 2012 alleging that he was denied an overtime opportunity on November 22, 2012, Thanksgiving of that year. (*Id.* ¶ 70.) Overtime is assigned based on seniority—a list indicating who is next in line for an overtime opportunity is created at the beginning of the year, with the most senior ACOE listed first. (*Id.* ¶ 66.) When an

overtime opportunity arises, the employee at the top of the list has the option of working the additional shift. (*Id.* ¶ 67.) Regardless of whether the employee accepts the opportunity, he or she is moved to the bottom of the list after being contacted about potential overtime. (*Id.*) If the employee has a scheduled vacation day or does not respond to the request, that person remains first on the list, but the overtime opportunity is then offered to the next person on the list. (*Id.*) On November 22, 2012, William Marshall worked overtime because he was at the top of the list and accepted the overtime opportunity when called. (*Id.* ¶ 70.) As a result, Outley's grievance was denied on January 9, 2013. (*Id.*)

*The Reservoirs*

On December 13, 2012, Mazur initiated another request for a pre-disciplinary hearing for insubordination, violation of safety protocols, and violation of a written directive. (*Id.* ¶ 62.) Mazur maintained that on four different days in early December, Outley disobeyed his directive to stop leaving reservoirs at dangerously low levels. (*Id.*) The hearing was held on February 13, 2013, and Outley was not disciplined because he indicated that he had not been instructed to close an important valve. (*Id.*)

### D.     2013 Events

*The Racially Derogatory Statements*

Outley filed a complaint with HR on or about March 1, 2013, alleging that on February 14, 2013, Christopher Houlihan—who was promoted to ACOE in April 2012 and transferred to the Lexington Pumping Station where Outley worked in August 2012—approached him and made racially derogatory statements, including, "Nigger, I don't like you" and "I'm going to get you." (*Id.* ¶¶ 49–50.) Outley also maintained that Houlihan told Outley he had been sent to work at Lexington pumping station to intimidate and threaten him. (*Id.* ¶ 50.) Houlihan maintains he

was transferred to Lexington because he requested to work closer to home. (*Id.* ¶ 49.) An investigation was completed, and HR found that Houlihan was credible, while Outley was not, and that "there was insufficient evidence to support a finding that Chris Houlihan violated the EEO Policy." (Dkt. 197-16 at 9–11.) Thus, Outley's allegations were unsustained. (*Id.* at 11.)

### The Inspector General Investigation

On May 20, 2013, Houlihan filed an HR complaint against Outley, alleging that Outley had discriminated against him based on race by denying him the opportunity to work overtime and to act up[12] in a senior position on February 27, 2013.[13] (Pl. Resp. ¶ 52.) After an investigation, HR concluded that Houlihan was credible, while Outley was not, and that Outley violated the City's EEO Policy by discriminating against fellow employees on the basis of race. (*Id.*) Outley was issued a written reprimand. (*Id.*) Outley maintains that O'Malley instructed him to allow a different employee to act up and that he simply followed that directive. (*Id.*) On April 5, 2013, the City's Office of the Inspector General also opened an investigation into the events, which was subsequently closed on March 4, 2014. (*Id.* ¶ 53.)

### The Violence in the Workplace Incident

Houlihan also filed against Outley a Violence in the Workplace Incident Report, which alleged that Outley threatened Houlihan with a knife on March 1, 2013. (*Id.* ¶ 54.) Once a VITWP Incident Report is filed, the Water Department generally separates the individuals involved in the incident by moving the accused aggressor. (*Id.* ¶ 55.) If HR finds the report to be

---

[12] When a COE takes time off or the position is vacant, ACOEs are given the opportunity to act up to fill the vacancy and receive increased pay for doing so. (Pl. Resp. ¶ 69.) To determine who will have the opportunity to act up, the ACOEs are placed on a list in order of seniority, and the opportunity to act up is given to the ACOE at the top of the list and so on moving down the list. (*Id.*)

[13] Outley had been acting up as COE since February 15, 2013, while another COE was on vacation, and he took the day off on February 27, 2013, so yet another employee was needed to act up to the CEO position for that day. (Dkt. 197-16 at 5.)

unfounded, the individual who was moved can then be returned to his or her original post. (*Id.*) Thus, on or about March 6, 2013, Outley was reassigned from the Lexington pumping station to the Mayfair pumping station, and again reassigned on or around March 11, 2013 to the Jardine water purification plant. (*Id.* ¶ 56.) After an investigation, HR found that there was insufficient evidence to establish that a violation of the City's Violence in the Workplace Policy occurred—there was no third-party present, so the only evidence in the record were Houlihan and Outley's conflicting statements. (Dkt. 197-5 at 24.) The investigation concluded on December 24, 2013, and Outley returned to Lexington on January 1, 2014. (Pl. Resp. ¶ 56; dkt. 197-5 at 22.)

*The Second Charge of Discrimination (May 9, 2013)*

On May 9, 2013, Outley filed a second charge of discrimination with the EEOC alleging he was retaliated against for filing a complaint of race discrimination with his employer by being transferred to a less desirable job location. (Pl. Resp. ¶ 74.) The EEOC sent Outley a right to sue letter on August 13, 2013. (Dkt. 118-2.)

*The Third Charge of Discrimination (October 25, 2013)*

On October 25, 2013, Outley filed a third charge of discrimination with the EEOC alleging race discrimination and retaliation. (*Id.* ¶ 75.) Outley alleged, among other things, that the City retaliated against him by denying him overtime, harassing him, subjecting him to racial and intimidating derogatory statements, transferring him to a less desirable work location, and continuously requiring him to face open ended disciplinary investigations with the threat of further discipline for filing a complaint with the City's HR Department and the EEOC. (*Id.*) Outley received a right to sue letter on this charge on January 16, 2014. (Dkt. 118-3.)

### E.    2015 Events

*The Denial of the Ability to Act Up*

On July 20, 2015, Outley filed a grievance alleging that he had not been allowed to act up to COE after Mazur retired on June 30, 2014 and Lexington was without an acting COE. (*Id.* ¶ 71.) His grievance was denied because a COE from a different pumping station was put in charge of Lexington until a permanent replacement (Maurice Walsh) was assigned to Lexington on August 10, 2015. (*Id.*; dkt. 197-10 at 100, 106.)

## ANALYSIS

## I.    Failure to Promote (Title VII)

To evaluate Outley's Title VII claim, the court looks at whether the evidence would permit a reasonable factfinder to conclude that racial discrimination caused the adverse employment action—here, the failure to promote. *Ortiz* v. *Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Although courts in the Seventh Circuit "no longer divide[] evidence into formal categories of 'direct' and 'indirect,' a plaintiff may still use the *McDonnell-Douglas* burden-shifting test to make the required showing." *Henderson* v. *Shulkin*, 720 F. App'x 776, 781 (7th Cir. 2017) (citing *McKinney* v. *Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 807 (7th Cir. 2017). Under the *McDonnell-Douglas* rubric, a plaintiff must make out a *prima facie* case in support of his claim by producing "evidence showing that: (1) []he was a member of a protected class; (2) []he was qualified for the position sought; (3) []he was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position," *Riley* v. *Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016), or who "had similar or lesser qualifications," *Whitefield* v. *Int'l Truck & Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014); *Pafford* v. *Herman*, 148 F.3d 658, 669 (7th Cir. 1998). If the plaintiff succeeds in making

the necessary showing, the burden shifts to the employer, who must articulate "a legitimate nondiscriminatory reason for the employment action," at which point the burden shifts back to the plaintiff to submit "evidence that the employer's stated reason is a pretext." *Riley*, 829 F.3d at 891–92.

Defendants contend that Outley cannot establish the second and forth elements of the *prima facie* case.[14] With respect to the second element, defendants point out that Outley was not the most qualified candidate. But Outley need only show he was qualified for the position, not that he was the *most* qualified. *See Baron* v. *City of Highland Park*, 195 F.3d 333, 340 (7th Cir. 1999) (finding that "even if [plaintiff] was not the most qualified candidate . . . he nevertheless [was] a qualified candidate.") Outley passed all portions of the promotion procedure during each of the relevant years and had gained much experience during his time as an ACOE. Indeed, if none of the applicants had received a "highly qualified" rating, the individuals in the "qualified" category (including Outley) would presumably have been promoted based on seniority and were thus qualified for the position. Outley has thus demonstrated that he was qualified for COE.

As to the fourth element, the court considers whether the City promoted someone outside of the protected class who had similar or lesser qualifications for the COE position. Given that Outley's Title VII claims have been limited to conduct that occurred after December 17, 2011, the court need only consider the COE promotion decisions made from 2012–2017.[15]

---

[14] As a threshold issue, defendants attempt to limit the relevant time period for Outley's failure-to-promote claim to only the 2012 promotion process. (*See* dkt. 196 at 1 n.1, 4 n.2.) But as this court previously ruled, "additional claims must be 'reasonably related to the allegations' included in the EEOC charge," and Outley's failure to promote allegations involve the same individuals and the same conduct—that defendants failed to promote him based on his race—and are therefore within the scope of Outley's first EEOC charge. (Dkt. 71 at 5–6.)

[15] Although defendants contend that an employee is not similarly situated to those higher on a promotional list (dkt. 196 at 9), "[s]o long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-

In 2012, two white individuals were promoted pursuant to the arbitration award resulting from the 2011 re-test. The City thus did not engage in its promotion procedure for that year; an arbitrator essentially determined who would be promoted. Similarly, no one was promoted in 2013. Given these circumstances, Outley has put forth no evidence for 2012 or 2013 that the City promoted someone outside of the protected class who was not better qualified for the COE position.

In 2014, two white men—Mark Henmueller and Joseph Lynch—were promoted. Both men and Outley passed all portions of the promotion procedure, and while Outley scored below the two men promoted on the first written test and the interview portion, he scored the same as Henmueller on the second written test.[16] Outley also had experience similar to (if not more than) the two men who were promoted—Henmueller and Outley were of nearly identical seniority (Henmueller started one day before Outley) and Outley was many years senior to Lynch. Outley had also served as ACOE (the position directly below COE) for more than fifteen years by the time the 2014 promotion period came around.

In 2015, a white man (Robert Mussen) and a black man (Andre Holland) were promoted. Both Outley and Mussen passed the written portion of the test (their scores have not been provided), which allowed them to move on to the interview portion. While the notes from the consensus meeting denote some negatives about Outley's interview performance, the notes from the meeting with respect to Mussen also contain some negatives—"could have elaborated more,"

situated requirement is satisfied." *Coleman* v. *Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). The individuals applying for the same promotion as Outley in a given year serve as appropriate comparators. *See, e.g.*, *Baron*, 195 F.3d at 340 (using other applicants who applied for a promotion in a given year and had higher scores on the oral examination portion of the relevant exam as comparators).

[16] On the first written test, Henmueller scored 100%, Lynch scored 95%, and Outley scored 85%. On the second written test, Henmueller scored 85%, Lynch scored 90%, and Outley scored 85%. On the interview portion, Henmueller scored 82%, Lynch scored 72%, and Outley scored 66%.

and "questions 4 & 5 he did miss." (Dkt. 197-11 at 31.) Further, Outley was much senior to Mussen.

Outley maintains that he turned in his submission for the 2016 test but was not called to take the test, while the City counters that Outley did not even apply for the COE position in 2016. The exhibit Outley submits of a computer dashboard displaying years for which Outley applied for the COE position is inconclusive because it lists neither 2016 nor 2011 as years for which Outley applied, and it is undisputed that Outley applied for the COE position in 2011. Further, while Outley is not listed on the City's lists of applicants, Outley has first-hand knowledge of whether he was called to take the test. There is thus a fact issue with respect to whether Outley applied for a promotion to COE in 2016. This is of no moment, however, because Outley has not even presented evidence of who was promoted in 2016, let alone demonstrated that the City promoted someone outside the protected class of similar qualification.[17]

Finally, in 2017, a white man (John Murphy) and a black woman (Katherine Ealy) were promoted. Again, Outley was more senior than Murphy. Both Outley and Murphy passed the written portion of the test (their scores are not part of the record) and completed an interview. And the consensus meeting notes are not overly effusive about either candidate. (*See, e.g.*, dkt. 197-11 at 39 (consensus meeting notes stating that Murphy did not hit enough points with respect to question 6)).

---

[17] Defendants produced the spreadsheet of applicants for promotion to COE in 2016, which appears to show that Thomas Barrett was promoted. (*See* dkt. 197-11 at 36.) Although the spreadsheet makes it clear that Barrett is less senior than Outley, there is no information about Barrett's race nor any notes from the consensus meeting, which would help the court determine whether Barrett was an individual outside the protected class and whether he had similar or lesser qualifications than Outley.

Thus, for the years 2012, 2013, and 2016, Outley has not established a *prima facie* case of race discrimination. For 2014, 2015, and 2017, the court cannot conclude that Outley failed to present sufficient evidence to establish that he had similar qualifications to those promoted to COE during the relevant time period. This does not mean that Outley should have been promoted instead of another candidate, only that the promotions of other white applicants were not a foregone conclusion when comparing Outley's qualifications to those who were ultimately promoted. *See Baron*, 195 F.3d at 340. Under the *McDonnell-Douglas* burden-shifting test, Outley has therefore established a *prima facie* case of race discrimination for 2014, 2015, and 2017, so the burden shifts to the City to present a legitimate, non-discriminatory reason for its failure to promote Outley.

The City has presented several such reasons. In 2014, Outley's test scores placed him in the "qualified" category rather than the "highly qualified category," and all individuals promoted were "highly qualified." In 2015, after interviewing all candidates that passed the written portion of the test, it was determined at the consensus meeting that Mussen and Holland possessed the qualifications best suited to fulfill the responsibilities of COE. The notes from that meeting indicate that Outley was "not ready for chief." (Dkt. 197-11 at 32.) He "didn't go into a lot of detail," was "short on answers concerning pumps," "was confusing on his answer for #5," performed "poorly on answer about what he'd do when [an] employee [is] injured," "made it sound it's as simple as pushing a button, which it's not," and "did not convey that he knew [the] answer." (*Id.*) Similarly, in 2017, after the interviews, the consensus committee determined that Ealy and Murphy possessed the qualifications best suited to fulfill the responsibilities of COE, and the interview notes with respect to Outley are generally unfavorable. These are legitimate, non-discriminatory reasons for the City's failure to promote Outley.

Having determined that the City met its burden, under *McDonnell Douglas*, the burden shifts back to Outley to show that the reasons the City proffered are pretext. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Tibbs* v. *Admin. Office of the Ill. Courts.*, 860 F.3d 502, 506 (7th Cir. 2017).

Although rambling and hard to discern (there is no section in Outley's response devoted to pretext), it appears that Outley offers the following to show pretext: (1) the written portions of the promotion procedure were not objective because "whites were given answers to multiple choice [questions] . . . ahead of time"; (2) the oral interview "required certain key phrases designed to trick applicants and provide a basis to lower their scores"; (3) the interview portion of the promotion process was highly subjective and blacks consistently scored lower on the interview portion than on the two written tests; (4) Outley was subjected to racially insensitive comments during his time at the Water Department; (5) newspaper articles and an OIG report from 2017–2018 indicate that there was a culture of racism within the Water Department; (6) no blacks were promoted to COE from 1989 until 2015; and (7) two other Water Department employees were not promoted because of racial discrimination.

Despite throwing spaghetti at the wall, none of it sticks. As to the first two contentions, Outley offers nothing more than his affidavit. Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Personal knowledge "includes inferences—all knowledge is inferential—and therefore opinions. But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from

that experience." *Visser v. Packer Eng'g Assocs.*, Inc., 924 F.2d 655, 659 (7th Cir. 1991) (internal citation omitted). Outley's affidavit does not purport to be based on personal knowledge—there is no indication of how he knows that white applicants were allegedly given answers to test questions ahead of time nor how he knows that the interview allegedly "required certain key phrases to trick applicants." Not to mention that this three-part process did not exist in 2015 and 2017. In other words, these statements, without more, are not grounded in observation or other first-hand personal experience, and thus cannot serve as a basis for establishing pretext.

Outley's third contention is similarly a nonstarter. True, black applicants often scored lower on the interview portion than on the two written tests, but this pattern was true for all applicants. In 2014, for example, all applicants scored lower on the interview than on either of the two written tests. Further, as to the subjective nature of the interviews, Outley's "claim that the subjective nature of the interview scores implies pretext is legally untenable, given [his] lack of evidence that the interview criteria and scoring system were a 'mask' for discrimination." *Hall* v. *City of Chi.*, 52 F. App'x 259, 263–64 (7th Cir. 2002).

With respect to the fourth contention, the record contains evidence of one instance in which Outley was subjected to racially insensitive comments—Houlihan allegedly stated in early 2013, "Nigger, I don't like you" and "I'm going to get you." While such statements are in no way acceptable in the workplace or otherwise, "stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Perez* v. *Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) (quoting *Hemsworth* v. *Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (overruled on other grounds)). Importantly, such remarks standing alone "do not establish discriminatory motive unless they were by the decision maker and can be

connected to the decision." *Id.* Houlihan made these comments in 2013, was a fellow ACOE, and was not a decisionmaker in the promotion process.

As to the fifth contention, the newspaper articles are hearsay, which is inadmissible in summary judgment proceedings. *See Eisenstadt* v. *Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (holding newspaper articles were hearsay and inadmissible for purposes of summary judgment). Further, while the articles reference a 2017 investigation into racist and sexist emails sent within the Water Department and the OIG report confirms that such emails were sent, these emails do not directly relate to Outley's failure to promote claim. There is no evidence that the individual who sent these emails had any involvement in the promotion process nor that such an incident bore on the process at all. *See Rozskowiak* v. *Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) ("Derogatory statements made by someone who is not involved in making the employment decision at issue are not evidence that the decision was discriminatory. . . . [T]here must be a real link between the bigotry and an adverse employment action.").

The sixth contention fares no better. While concerning if true, Outley has presented no evidence that black individuals were not promoted to COE from 1989 until 2015. Simply stating as much does not make it so. Outley must put up evidence if he intends to make such a contention part of his case.

Finally, Outley presents a declaration by Curtis Young and the deposition of Katherine Ealy, both black employees within the Water Department. But Young applied and was repeatedly denied promotion to the ACOE position, not the COE position. He also retired in 2011, well before the relevant years in question here. Outley cannot show pretext for the City's decision not to promote him to CEO in 2014, 2015, and 2017 through the declaration of a man applying for an entirely different position three years before the first relevant promotion period.

As to Ealy, Outley contends, without support, that her promotion in 2017 came only after her deposition was taken in this case and another discrimination lawsuit was filed. He also states that Ealy's qualifications clearly exceeded those of her white colleagues in previous years that she applied for promotion to COE.[18] These assertions are again not based on first-hand knowledge, and are pure speculation.[19]

In sum, although investigations into the Water Department's alleged culture of discrimination are apparently ongoing (*see, e.g.*, dkt. 203-13 (Chicago Tribune reporting water commissioner resigned in May 2017 after inspector general investigation into racist and sexist email messages)), Outley's submission is devoid of relevant evidence to support pretext specific to his case. Based on its testing procedures—which appear to have been applied evenhandedly to

---

[18] Ealy scored fourth highest out of sixteen applicants on the "subjective" interview portion of the exam in 2014 and tied for the second-best average test score for that year, but she was the second-most junior applicant out of the six highly qualified individuals, two of whom were promoted ahead of her based on seniority. There is no indication that Ealy was not promoted for any other reason. Ealy failed the written test in 2015 when the City moved to a two-part test. She was promoted in 2017.

[19] There are two other nuances to this inquiry. First, Outley's complaint lists three other individuals who were allegedly denied a promotion to COE based on race. But Outley fails to substantively address these individuals in his summary judgment submission or produce evidence to back up these allegations. Because summary judgment is the "put up or shut up" moment in a lawsuit, the court will not consider such bare allegations. *See Grant* v. *Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial."). Second, it is true that comparator evidence such as that established in the fourth element of the *prima facie* case (i.e. evidence that the City promoted someone outside of the protected class who had similar or lesser qualifications for the COE position) is relevant at the pretext stage. *See Coleman* v. *Donahoe*, 667 F.3d 835, 857–58 (7th Cir. 2012) ("Our precedents also teach that the similarly-situated inquiry and the pretext inquiry are not hermetically sealed off from one another. We have often noted that the prima facie case and pretext analyses often overlap."). But this evidence is generally combined with additional evidence of pretext when courts find that a plaintiff has presented sufficient evidence to defeat summary judgment on the pretext issue. *See, e.g.*, *id.* at 857 ("Combined with the additional circumstances discussed above, Coleman's [comparator] evidence is sufficient to defeat summary judgment on the pretext issue."). As discussed above, although Outley attempts to present pretext evidence in a myriad of different forms, none actually establishes pretext. Further, although Outley presents evidence that he was qualified for the COE position, he has not presented evidence that he was better qualified than the individuals chosen for promotion. Thus, standing alone, Outley's comparator evidence does not demonstrate pretext.

all applicants for promotion to COE—the City determined that Outley would not be promoted. In the absence of pretext, the court "does not sit as a superpersonnel department that reexamines an entity's business decisions." *Baron*, 195 F.3d at 341 (internal citation omitted). The City "should never be forced to promote a worker who does not meet [its] needs." *Id.*

Pulling the lens back, as the Seventh Circuit has instructed in *Ortiz*, when looking at the evidence as a whole to determine whether it would permit a reasonable factfinder to conclude that Outley's race caused the failure to promote, the court finds that it does not. Thus, summary judgment is granted as to count I.

## II. Retaliation (Title VII)

Title VII prohibits an employer from retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice. 42 U.S.C. § 2000e–3(a); *see also Brown* v. *Ill. Dep't of Nat. Res.*, 499 F.3d 675, 684 (7th Cir. 2007). To prevail on his Title VII retaliation claim, Outley must prove that "(1) he engaged in an activity protected by statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." *Lewis* v. *Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).[20] It is undisputed that Outley engaged in a protected activity when he complained to HR and filed three EEOC charges. Defendants contend, however, that Outley cannot prove he suffered an adverse action, and that even if he had suffered and adverse action, he cannot establish the requisite causal connection.

---

[20] Although courts in the Seventh Circuit have discussed "direct" and "indirect" methods through which a claimant may prove a *prima facie* retaliation claim, in *Ortiz*, 834 F.3d at 763, the Seventh Circuit cautioned that these two methods are "just means to consider whether one fact . . . caused another . . . and therefore are not 'elements' of any claim." Instead, courts are to "evaluate the evidence as a whole to determine if it 'would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action.'" *Lewis*, 909 F.3d at 867 (quoting *Ortiz*, 834 F.3d at 764–

In the Title VII retaliation context, a materially adverse action "need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Poullard* v. *McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). The provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. and Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 67, 126 S. Ct. 2405 (2006). Thus, "'threats of unspecified disciplinary action' d[o] not constitute adverse actions, though such threats 'may well be relevant evidence of retaliatory intent behind a more concrete adverse action.'" *Lewis*, 909 F.3d at 868 (quoting *Poullard*, 829 F.3d at 856–57). Further, to show a causal connection, Outley must produce some evidence that the City would not have taken the allegedly adverse action but for his protected activity. *Baines* v. *Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).

Outley's response brief as it relates to his retaliation claim does little more than copy and paste the legal standard for retaliation from defendants' opening brief and fails to provide any substantive discussion with respect to this claim. He curiously asks the court to focus on events that are time barred (even recognizing this in his submission) and then notes that the defendants "are correct in pointing to the issue of denial of overtime and unwarranted discipline as areas where [Outley] suffered adverse employment actions." (Dkt. 201 at 28.) Clearly, the court will not evaluate time-barred events, but it has done its best to identify potential sources of alleged retaliation from the facts provided. As titled in the background section above, these include (1) the doctor's note; (2) the flag; (3) the denial of overtime; (4) the reservoirs; (5) the racially

---

65). In any case, the parties have briefed only the direct method of proof, the elements of which are laid out above.

derogatory statements; (6) the inspector general investigation; (7) the violence in the workplace incident; and (8) the denial of the ability to act up. Outley also maintains that he was retaliated against by having several of his disciplinary actions remain pending.

With respect to the doctor's note,[21] the flag, the reservoirs, the inspector general investigation, and the fact that some of his disciplinary actions remained pending, there is no evidence of a tangible injury, and "[f]ederal law protects an employee only from retaliation that produces an injury." *Stephens* v. *Erikson*, 569 F.3d 779, 790 (7th Cir. 2009); *see also Poullard*, 829 F.3d at 856 ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation."). Specifically, there is no evidence that the doctor's note incident resulted in discipline, the flag incident resulted in mere verbal counseling, the reservoirs incident affirmatively did not result in discipline, and the conduct investigated by the inspector general carried with it a written reprimand (because Outley was found to have discriminated against fellow employees in violation of the City's EEO Policy). *See Elue* v. *City of Chi.*, No. 16 C 9564, 2017 WL 2653082, at *7 (N.D. Ill. June 20, 2017) (citing *Cole* v. *Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) ("Oral and written reprimands . . . do not constitute adverse employment actions when they are not tied to changes in the terms and conditions of employment."). Further, the fact that some of the entries on Outley's disciplinary history log were left open, is an administrative failure, which was eventually resolved and does not constitute retaliation. *See Lewis*, 909 F.3d at 868 (noting that isolated administrative errors that were later resolved did not cause lasting harm or injury

---

[21] All conduct surrounding the doctor's note incident, including the request for a pre-disciplinary hearing for insubordination occurred in January and February 2012, months before Outley filed his first EEOC charge and HR complaint. Even if this conduct was an adverse action, there is thus no causal connection.

sufficient to dissuade a reasonable employee from engaging in protected activity). In sum, Outley has not explained what effect, if any, each of these alleged incidents had on his compensation, career prospects, or conditions of employment. *See Dass* v. *Chi. Bd. of Educ.*, 675 F.3d 1060, 1069 (7th Cir. 2012) (laying out the three general categories of actionable, materially adverse employment actions); *Poullard*, 829 F.3d at 857 (summarizing same).

The denial of overtime and the ability to act up similarly do not constitute adverse actions given the relevant context. There is no evidence that the procedures for meting out overtime were not followed—William Marshall worked overtime because he was at the top of the overtime list and accepted the opportunity when called. Outley was thus not entitled to overtime on November 22, 2012. Likewise, Outley was not permitted to act up to COE when Mazur retired in June 2014 because a COE from a different pumping station was put in charge until a permanent replacement was assigned. There was thus no opportunity for Outley to act up.[22]

As to the racially derogatory statements, while in no way appropriate, there is insubstantial factual support, even construing the facts in the light most favorable to Outley, that Houlihan was sent to work at the Lexington pumping station to intimidate and threaten Outley. Houlihan maintains he was transferred to Lexington because he requested to work closer to home. Further, even if Houlihan was sent to intimidate Outley, there is no evidence that it caused Outley harm or injury in the retaliation sense, as he was not disciplined in connection with the alleged intimidation, nor did Houlihan have any authority over Outley as they were both ACOEs. *See Lewis*, 909 F.3d at 869 (finding insufficient evidence of coworker monitoring plaintiff's activities at work where coworker testified she never did such monitoring and concluding that

---

[22] Even if a COE from the Lexington pumping station should have been permitted to act up to COE once Mazur retired (which is not clear based on the evidence provided to the court), Outley has provided no evidence that he, as opposed to another COE, should have been afforded such an opportunity.

being monitored while at work would not dissuade a reasonable employee from engaging in protected activity).

Finally, while the violence in the workplace incident stands out from the others, it still does not amount to an adverse action when put in context. Outley was reassigned to a different pumping station in March 2013, consistent with the Water Department's practice of moving the alleged aggressor after a violent incident. Once HR determined there was insufficient evidence to establish a violation of the City's Violence in the Workplace Policy because there were conflicting statements and no third-party present, Outley was returned to the Lexington pumping station a few days later, on January 1, 2014. Outley has not presented any evidence that this change in workplace location affected his compensation or career prospects. Further, although his conditions of employment were altered because he was sent to a new location, the conditions in which he worked were not "changed in a way that subject[ed] [him] to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in [his] workplace environment," as contemplated by the retaliation framework. *Dass*, 675 F.3d at 1069. In fact, Outley's primary complaints with the new stations were that one was further from his home and the other was inconvenient to get to because of traffic. Such a move, on a temporary basis while an investigation into workplace safety was ongoing, would not dissuade a reasonable employee from engaging in protected activity.

Because Outley has not presented an adverse employment action, the court need not reach the causal connection step. Summary judgment is granted as to Outley's retaliation claim.

**III.    42 U.S.C. § 1981 Claims Against the Individual Defendants**[23]

The substantive standards and methods that apply to Title VII also apply to 42 U.S.C.

§ 1981. *Ferrill* v. *Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) ("The

legal analysis for discrimination claims under Title VII and § 1981 is identical."); *Johnson* v.

*Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir.

2013); *see also Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 403 (7th Cir. 2007) (collecting

cases), *aff'd* 553 U.S. 442, 128 S. Ct. 1951 (2008). In other words, Outley's discrimination

claims under § 1981 survive to the same extent as his claims under Title VII. Thus, because

Outley's Title VII claims have been dismissed, the court also grants summary judgment on

Outley's § 1981 claims.

There is, however, one additional wrinkle to this analysis. Unlike Outley's Title VII

claims, his § 1981 claims are subject to a four-year statute of limitations, so the hiring decisions

from 2010 and 2011 are relevant here. For the same reasons as those discussed with respect to

the Title VII failure to promote claim, Outley was qualified for COE. Concerning the fourth

element—whether the City promoted someone outside the protected class who was not better

qualified for COE—no one was promoted in 2010, so the court need only look at the promotion

decision for 2011. In that year, four white men were promoted. On the first written test, Outley

scored the same as three of the men and better than the fourth. On the second written test and the

interview portion, Outley scored below the four men promoted, but only by a few percentage

points with respect to two of the candidates on the interview portion. Further, as discussed above,

---

[23] There is no claim under § 1981 against a municipality. *De* v. *City of Chi.*, 912 F. Supp. 2d 709, 725 (N.D. Ill. 2012) (citing *Jett* v. *Dallas Independent School District*, 491 U.S. 701, 731, 109 S. Ct. 2702 (1989)). Instead, a plaintiff must "assert a cause of action against state actors under § 1983 to remedy violations of the civil rights secured by § 1981." *Id.* To the extent that Outley has asserted such claims, the court addresses them below.

Outley had ample training and experience for the COE position. Thus, for 2011, Outley has presented sufficient evidence to establish that the City promoted a white male that was not better qualified for COE and has therefore established a *prima facie case* of race discrimination. But the City presented a legitimate, non-discriminatory reason for its failure to promote Outley—all individuals in 2011 who were promoted were in the "highly qualified" category, while Outley was only "qualified"—and, as discussed at length above, Outley has failed to carry his burden to show that the reasons the City proffered were pretext. Outley's claim as it relates to 2011 thus cannot be maintained under § 1981.

## IV.     42 U.S.C. § 1983 Claims Against the Individual Defendants

The standards for proving discrimination and retaliation under Title VII also apply equally to § 1983 claims. *See Williams* v. *Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). Section "1983 claims against individual defendants can be dismissed on the same basis as Title VII claims." *Hildebrandt* v. *Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1036–37 (7th Cir. 2003); *see also Finke* v. *Trustees of Purdue Univ.*, No. 12 C 124, 2014 WL 2938384, at *13 (N.D. Ind. June 30, 2014) ("Analysis of [Title VII and § 1983] claims is essentially the same, though individual defendants have no liability under Title VII, whereas they may under § 1983.). Thus, because the court has determined that no reasonable jury could find a violation of Title VII, it follows that no reasonable jury could find that the individual defendants violated Outley's constitutional rights.

The court previously found, however, that Outley's § 1983 claims are limited to conduct after February 28, 2011, while his Title VII claims are limited to conduct after December 17, 2011. Thus, like his § 1981 claims, the court must consider the promotion decision from 2011 in addition to those from 2012–2017. The same analysis as that under § 1981 applies to the 2011 decision. Summary judgment is thus granted as to Outley's § 1983 claims against the individual defendants for all relevant years.

## V.    *Monell* Claim

A municipality may be liable for constitutional violations under 42 U.S.C. § 1983. *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018 (1978). "The critical question under *Monell* . . . is whether a municipal . . . policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson* v. *Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). To hold the City liable under *Monell*, Outley must therefore show that he suffered a constitutional injury caused by the City's (1) express policy, (2) custom or practice, or (3) official policymaker. *Thomas* v. *Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). Outley must also establish causation by showing that the "governmental custom . . . not only causes but is the moving force behind the deprivation of constitutional rights." *Wilson* v. *Cook Cty.*, 742 F.3d 775, 779 (7th Cir. 2014). This inquiry is short-circuited here, however, because the City cannot be liable under *Monell* since Outley has not presented evidence from which a reasonable jury could conclude that he suffered a constitutional injury. *See, e.g.*, *Houskins* v. *Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (noting that where plaintiff fails to establish deprivation of a constitutional right, *Monell* claims also fail); *see also Mitchell* v. *City of Chi.*, No. 9 C 3315, 2013 WL 870576, at *12 (N.D. Ill. Mar. 7, 2013) (collecting cases).

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 195) is granted, and the case is dismissed in its entirety.

Date: January 11, 2019

_____
U.S. District Judge Joan H. Lefkow